JACKSON, RESPONDENT, *v.* McDONALD ET AL., APPELLANTS.

(No. 8347.)

(Submitted April 30, 1943. Decided October 18, 1943.)

[143 Pac. (2d) 898.]

*Mr. D. W. Doyle*, for Appellants,

*Mr. S. J. Rigney*, for Respondent,

MR. JUSTICE ANDERSON delivered the opinion of the court.

This is an appeal from a judgment in an action for possession of certain horses which had been dealt for and purchased under circumstances giving rise to adverse claim of title by two different parties.

One of the parties, W. R. McDonald, the appellant herein, lived in Glacier county, Montana, where he was engaged in ranching and dealing in horses. In the fall of 1939 he was buying and sell horses to the government for the remount service; Galbreath, a horse buyer, was going to Canada to look for horses. McDonald arranged with Galbreath to purchase horses for him of the type he wanted for sale to the government. To facilitate the handling of any such transaction in Canada, it was arranged that the horses dealt for should be checked by J. S. Low, a business man at Cardston, and that Low should take care of drafts at the bank there for such horses as were selected. McDonald had had similar arrangements previously with Galbreath and Low to handle the purchase of horses. Under this arrangement, Galbreath went across into Canada and dealt for the purchase of some horses from J. J. Bowlen, a rancher near Medicine Hat. In looking over the horses Bowlen was offering for sale, Galbreath found only some of them suitable for the remount service. Bowlen would not sell unless he disposed of the whole herd. Galbreath dealt for all of the Bowlen horses. He drew two drafts on McDonald to cover the purchase price; one for $1,280, and an-

other for something over $960, the exact amount not being made clear by the evidence. Bowlen says the reason for the two drafts was that the buyers were not prepared then to pay all of the purchase price; that one draft was drawn for $1,280 at sight, and the other smaller draft was to be paid later. Galbreath testified that the $1,280 draft covered the horses suitable for the remount service, and that the smaller draft was for the rest of the horses; that his business relations with McDonald were such that he could draw on him in his own deals, leaving the impression that he was not dealing altogether for McDonald. Bowlen knew Low and called him by telephone and arranged with him to hold and take care of the horses until they were paid for. All of the horses were shipped by freight to Low at Cardston. The drafts were sent to the Cardston bank. After inspection by Low the horses selected as suitable for the remount service were delivered to McDonald at the boundary line on October 16, 1939. Low at the same time presented a statement to McDonald for several items, including the draft for $1,280, as covering the Bowlen horses which were then delivered. McDonald paid the full amount called for by the statement, including the $1,280 draft item.

The remainder of the Bowlen horses were left in Low's pasture at Cardston. They were a mixed lot and not such as McDonald had said he would buy. Galbreath nevertheless had dealt for them with the use of the drafts drawn on McDonald, and had represented to Bowlen that McDonald would pay. The record does not show that any information was conveyed to McDonald at the time concerning the purchase of this mixed lot, nor as to the smaller draft drawn on him. He had heard talk about these horses but had said they were not what he wanted.

The settlement with Bowlen for the amount covered by the smaller draft was delayed. Bowlen was pressing for payment, and was eventually taken care of by the horses being dealt off to Ira L. Jackson, the respondent herein. The price Jackson paid was $2,500. Out of this the amount owing to Bowlen was taken care of. The balance, so far as the record shows, was retained by Low to cover the import duty, cost of pasturing and other expense

of handling. The horses were driven across the line and delivered to Jackson at Peskan, Montana, the port of entry, on January 3, 1940, by Bowlen and Low.

Before dealing with Jackson, Low had called Bowlen by telephone and told him they had a deal whereby he would get his money. Bowlen came to Cardston and there talked with Jackson but appears not to have had anything to do with the deal other than to sign the bill of sale and deliver over certain pedigree papers with the horses and get his money.

The circumstance of Jackson's dealing for the horses was to facilitate the transfer of money from Canada to the United States. He had recently sold out his interests in Canada, and had moved to the state of Washington. He dealt with Low to buy the horses for the price of $2,500 with the understanding that after they had crossed over into the United States a buyer would be found to take them off his hands and pay him the $2,500. In that way Jackson would effect the transfer of the money into the United States. The exportation of the horses into the United States under this deal was cleared by the Canadian and American customs officers, the horses being declared as property of Jackson.

After the horses were delivered across the line, they were left by Jackson at the Galbreath ranch, which is situated near the port of entry. Efforts were made to sell the horses but without any results. Jackson tried to sell them to McDonald but McDonald told him they were not what he wanted and that he was not interested. Several months elapsed with the horses remaining at the Galbreath ranch and with no further developments.

In the meantime McDonald, having heard more of the dealings between Galbreath and Bowlen, decided the horses were his. He brought suit against Low and Galbreath to get possession of the horses, claiming them as owner. Under claim and delivery proceeding the horses were taken possession of by the sheriff, Armstrong, and, no redelivery bond being filed by defendants, they were delivered to McDonald, the plaintiff in that action, Mc-

Donald left the horses with Dave Yegen at his ranch. This was in the month of October.

Jackson, upon learning of the McDonald suit and the horses being taken, came to Montana and brought action against Mc-Donald and sheriff Armstrong and Dave Yegen to recover the horses and for damages. The defendants answered jointly, denying Jackson's ownership and alleging ownership in McDonald. The McDonald case was continued and held open by stipulation, whereby it was agreed that the judgment in the Jackson case should control in the disposition of the McDonald case.

The Jackson case went to trial in due course. It was tried to the court without a jury and resulted in judgment for the plaintiff, Jackson recovering possession of the horses and $500 damages. The defendant Yegen had died in the meantime and the action was dismissed as to him. The appeal is from the judgment.

The error specified is in the rendition of the judgment for plaintiff. The contention is that the title to the horses passed to McDonald when Bowlen first dealt with Galbreath, and "that the testimony in support of plaintiff's ownership is so inherently improbable that it is not sufficient to justify the judgment."

Jackson relies on the transaction he himself had with Low and Bowlen at Cardston where the horses then were. He there talked with Low and Galbreath, who had the handling of the horses, and they came to agreement upon a sale to him. Low telephoned Bowlen to come to Cardston to complete the deal, which he did. Jackson paid the price agreed upon and the horses were driven across the line into Montana and delivered to him. He was given a bill of sale signed by Bowlen and he was also given pedigree papers for some of the horses and other record papers which had been furnished by Bowlen.

The trial court took the view that by this transaction Jackson became the owner of the horses with title passing to him from Bowlen. We think there is ample support in the evidence for that view and conclusion. No matter what the negotiations of Galbreath and Low with Bowlen may have been, Bowlen had not parted with control of possession of the horses. He shipped them

to Low at Cardston but with instructions to him not to make delivery of them until the purchase price was paid. The purchase price had not been paid excepting the $1,280 paid by McDonald and for which he took delivery of the horses suitable for the remount service. The other mixed lot was still held at Cardston and the smaller draft was unpaid. That continued to be the status of the deal for over two months. When Jackson came along, Low sent for Bowlen to come to Cardston. There they made the deal with Jackson, Low, Galbreath and Bowlen all being there and participating in the transaction. Bowlen was at the corrals on the American side when the horses were delivered there to Jackson. He was about with Low and Galbreath and Jackson until the deal was fully consummated by the delivery of the horses and bill of sale.

Even though there had been a deal for the purchase of these horses for McDonald, and even though a part of the purchase price had been paid, the purchase of the horses by Jackson with delivery to him, under the circumstances here shown, gave him title as against any claim of ownership by McDonald. The general rule, which has application here, is stated in 24 R. C. L., page 49, Sales, section 312, as follows: ''While there is no doubt that property in chattels may pass by a bargain and sale for a sufficient consideration, without delivery, as between the parties to the sale, still, as against every one but the seller, there must be a delivery of the possession. And as a general rule when the same chattel is sold to two different persons, by transfers equally valid as between the seller and the buyer, he who first lawfully acquires the possession will hold it against the other.''

This rule is embodied in our statute, section 8604, Revised Codes, which makes transfers of personal property without delivery fraudulent as against purchasers or encumbrancers in good faith subsequent to the transfer.

With the evidence showing no delivery to McDonald and that there was delivery to Jackson in a bona fide purchase made by him from Bowlen, the owner, the conclusion necessarily follows that title passed to Jackson. Nothing having transpired there-

after to divest Jackson of his title, the court's finding that Jackson was the owner of the horses and entitled to possession is correct.

The fact that Jackson's purpose in buying the horses was to afford a means of transferring his money from Canada did not necessarily change character of the transaction. There is nothing in the record to show that the transaction was merely an accommodation to Jackson, the title to the horses to remain as before.

The plaintiff having been wrongfully deprived of possession of the horses is entitled to recover for the damage he sustained thereby. The judgment makes an award of such damages in the sum of $500 against both McDonald and Armstrong, the sheriff, "for injuries, damages to property, loss of time, * * *, for the unlawful taking, withholding and injuries to the said property, and money expended in pursuit of the same by the plaintiff prior to the commencement of this action, * * *." The plaintiff by his complaint claims damages for the taking of the property as well as for its detention. By section 9363, Revised Codes, such damages are made recoverable, the provision therein being that in the trial of such an action damages "which the prevailing party has sustained by reason of the taking or detention of such property" may be assessed.

There is ample evidence to show that damage was suffered, and the only question of difficulty is in arriving at the amount. Plaintiff was unable to fix definitely the amount of each item of damage claimed. He produced the best evidence available and furnished to the court a reasonable basis for estimating the loss which he had sustained. It was for the court trying the case to make a fair and reasonable estimate of the loss. (15 Am. Jur. 414, Damages, sec. 23.) The evidence, though uncertain as to amounts, is substantial and is sufficient to sustain the court's finding and judgment as to amount.

There can be no recovery of damages from the defendant Armstrong. His only connection with the transaction was in the capacity of sheriff—serving process and carrying out the

direction of process placed in his hands for service and action. On written demand from McDonald, supported by affidavit and bond as provided by statute, section 9223, Revised Codes, he took possession of the horses, and, no redelivery bond being furnished, they were delivered to McDonald, the plaintiff, as provided by section 9229 Revised Codes. Jackson made no demand on sheriff Armstrong for possession of the horses in conformity with section 9234. Without such demand made he had no valid claim against the sheriff. This is so by reason of the express provision of section 9234, relating to third-party claims in claim and delivery proceedings, which reads as follows: "Claim of property by third person. If the property taken be claimed by any other person than the defendant or his agent, and such person make affidavit of his title thereto, or right of the possession thereof, stating the grounds of such right or title, and serve the same upon the sheriff, the sheriff shall not be bound to keep the property or deliver it to the plaintiff, unless the plaintiff, on demand of him or his agent, indemnify the sheriff against such claim by an undertaking by two sufficient sureties, accompanied by their affidavits that they are each worth double the value of the property as specified in the affidavit of the plaintiff, over and above their debts and liabilities, exclusive of property exempt from execution, and are freeholders or householders in the county; and no claim to such property by any other person than the defendant or his agent shall be valid against the sheriff unless so made."

The judgment, insofar as it grants recovery of damages from defendant Armstrong, is erroneous as a matter of law.

The cause is remanded to the district court with direction to modify the judgment to conform to this opinion, and with such modification being made, the judgment is affirmed.

MR. CHIEF JUSTICE JOHNSON and ASSOCIATE JUSTICES ERICKSON, MORRIS and ADAIR concur.

Rehearing denied January 4, 1944.